IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| MOUNTAIN VALLEY PIPELINE, L.L.C., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:17-cv-211 |
| ) | |
| AN EASEMENT TO CONSTRUCT, ) | |
| OPERATE AND MAINTAIN A 42-INCH ) | |
| GAS TRANSMISSION LINE ACROSS ) | |
| PROPERTIES IN THE COUNTIES OF ) | |
| BRAXTON, LEWIS, HARRISON, ) | |
| WEBSTER, AND WETZEL, WEST ) | |
| VIRGINIA, et al. ) | |
| ) | |
| Defendants. ) | |

## POST-HEARING BRIEF OF DEFENDANTS REPRESENTED BY APPALACHIAN MOUNTAIN ADVOCATES, INC.; THE LAW OFFICE OF ISAK HOWELL; AND LOLLAR LAW PLLC

DEREK O. TEANEY (WVBN 10223)
APPALACHIAN MOUNTAIN ADVOCATES, INC.
P.O. Box 507
Lewisburg, WV 24901
Telephone: (304) 793-9007
Facsimile: (304) 645-9008
Email: dteaney@appalmad.org
*Counsel for Appalachian Mountain Advocates Defendants*[1]

ISAK J. HOWELL (WVBN 11558)
LAW OFFICE OF ISAK HOWELL
119 Norfolk Ave. SW # 330
Roanoke, VA 24011
Telephone: (540) 998-7744
Facsimile: (304) 645-9008
Email: isak@howell-lawoffice.com
*Counsel for Law Office of Isak Howell Defendants*[2]

---

[1] Charles F. Chong and Rebecca Ann Eneix-Chong; Lorena B. Krafft; and Teresa D. Erickson.

[2] Charles F. Chong and Rebecca Ann Eneix-Chong; Brian and Helen Montague Van Nostrand; Lorena B. Krafft; Nancy Jane Shewmake Bates; Teresa D. Erickson; and William G. Lloyd.

CHARLES M. LOLLAR JR. (WVBN 13013)
LOLLAR LAW, PLLC
109 E. Main St., Suite 501
Norfolk, VA 23510
Telephone: (757) 644-4657
Facsimile: (757) 644-4659
Email: chuck@lollarlaw.com
*Counsel for Lollar Law Defendants*[3]

---

[3] Arthur C. Roberts and Judy D. Roberts; Trustee of the John A. Bright Revocable Living Trust; Adam L. Matheny; Brent Fairbanks; Dale Eastham; David Fairbanks; Edward Charles Smith, II; Edward Charles Smith, Sr.; George Ernest Bright; Glenn D. Matheny, II; Jeremy Collins; Michael Fairbanks; Todd Edward Smith; Travis Eastham; and William Townsend Bright. The Lollaw Law Defendants are also represented by Stevens and Stevens, Attorneys at Law, PLLC.

Landowners, identified above, respectfully submit that the evidence produced at the January 23, 2018 Motions Hearing shows that Plaintiff Mountain Valley Pipeline, LLC ("MVP") has failed to establish the requirements for a preliminary mandatory injunction. Accordingly, the Court should deny its motion seeking February 1, 2018 possession of Landowners' properties.

**I. A Mandatory Injunction Is Never Automatic, Even in NGA Condemnation Actions.**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. U.S. 7, 24 (2008).[1] "Mandatory injunctive relief in any circumstance is disfavored and warranted only in the most extraordinary circumstances," *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994), even in NGA condemnation actions. *E. Tenn. Nat. Gas. Co. v. Sage*, 361 F.3d 808, 828 (4th Cir. 2004) (permitting mandatory injunctions for immediate entry under FERC Certificates only when "exigencies of the situation demand such relief").

**II. MVP Has Failed To Make A Clear Showing That Irreparable Harm is Likely.**

The exacting test articulated in *Sage* has grown even more demanding in light of *The Real Truth About Obama, Inc. v. F.E.C*, 575 F.3d 342, 346–47 (4th Cir. 2009). *Sage* applied the standard from *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189 (4th Cir. 1977). 361 F.3d at 828. Under *Blackwelder*, a lesser showing of irreparable harm could support an injunction if a particularly strong showing of likelihood of success on the merits was made. 550 F.2d at 195. But *Real Truth about Obama* recognized that *Blackwelder*'s lenient standard was "explicitly rejected in *Winter*." 575 F.3d at 347. Accordingly, *Real Truth About Obama* requires "a clear showing that [a party] is likely to be irreparably harmed absent preliminary relief." *Id.*

In *Sage*, because the pipeline developer was *guaranteed* success on the merits, 361 F.2d at 829–30, a *de minimis* showing of *possible* irreparable harm would suffice under *Blackwelder*. After *Real Truth About Obama* and *Winter*, a pipeline developer must make a *clear showing* that

---

[1] *See also Mylan Pharm., Inc. v. USFDA*, 23 F.Supp.3d 631, 639–40 (N.D. W. Va. 2014).

1

irreparable harm is *likely*, no matter its likelihood of success. *Sage*, therefore, cannot be applied here without modification. MVP must clearly establish irreparable injury. It has not.

### A. MVP Can Comply With its FERC Certificate Without The Relief it Seeks.

*Sage* is the only reported Fourth Circuit injunction decision in an NGA condemnation case and, hence, the only binding authority here.[2] *Sage*, a panel opinion, did not and could not abrogate Fourth Circuit precedent precluding economic harm from constituting irreparable harm. *Long v. Robinson*, 432 F.2d 977, 980 (4th Cir. 1970); *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). *Sage*'s true finding on irreparable harm is this: "It would not be possible to meet FERC's deadline without a preliminary injunction." 361 F.3d at 829. *Sage* emphasized that finding twice, underscoring its key role in the irreparable harm analysis. *Id.* at 830.[3]

Here, that key factor is absent. Nowhere does MVP's FERC Certificate contemplate construction commencement by February 1, 2018, or an in-service date of December 2018. To the contrary, the FERC-imposed deadline is October 13, 2020—still 33 months away for a project that MVP can place in service in 10 months. P's Ex. 1 at 108. FERC contemplated that whatever public necessity the pipeline would serve will be met if the pipeline is constructed by October 13, 2020. MVP asks this Court to enforce its FERC Certificate as written. ECF #97 at 7. As written, MVP's Certificate does not require immediate possession, and MVP can comply

---

[2] The district court opinions cited by MVP are of limited value. They are largely devoid of in-depth reasoning, fail to establish consistent rules, and were frequently uncontested by the affected landowners. *Cf. U.S. v. Hemingway*, 734 F.3d 323, 335 (4th Cir. 2013) (concluding that prior decision was not controlling precedent on an uncontested issue); *Trustees of St. Paul Electrical Const. Indus. Fringe Benefit Funds v. Martens Elec. Co.*, 485 F.Supp.2d 1063, 1068–69 (D. Minn. 2007) (holding default judgments to have little persuasive value).

[3] The FERC deadline was also a key factor in many of the district court cases on which MVP relies. *See, e.g., Fla. Se. Connection, LLC v. 0.821 Acres of Land,* 223 F. Supp. 3d 1227, 1233 (M.D. Fla. 2016); *Tex. E. Trans., LP v. 3.2 Acres*, No. 2:14-CV-2650, 2015 WL 152680, at *6 (S.D. Ohio Jan. 12, 2015); *Tenn. Gas Pipeline Co. v. 0.018 Acres of Land*, No. CIV.A. 10-4465 JLL, 2010 WL 3883260, at *3 (D.N.J. Sept. 28, 2010); *Guardian Pipeline, L.L.C. v. 295.49 Acres of Land*, No. 08-C-0028, 2008 WL 1751358, at *22 (E.D. Wis. Apr. 11, 2008).

with its Certificate without immediate possession. Ds' Exs. 1 & 2; Tr. at 179:15 to 180:4.

In the summer of 2017, MVP created alternative schedules for implementation in case it was unable to timber the pipeline route during the winter of 2017-2018. *Id.* at 152:18–22, 158:9–15. Under either schedule, MVP would achieve an in-service date of no later than December 7, 2019. Ds' Ex. Nos. 1 & 2. Neither of those schedules jeopardized FERC's October 13, 2020 deadline, the June 1, 2020 in-service date deadline in MVP's shipping agreements, or timely reclamation. Tr. at 154, 159.[4] Mr. Cooper also admitted that MVP would most likely build the pipeline under one of those schedules absent an injunction. *Id.* at 179:17 to 180:4.

The only "deadline" at risk here is MVP's self-imposed in-service date of late 2018. But MVP voluntarily assumed that risk when it designed its preferred schedule—with full knowledge that that schedule might be unworkable at least as early as the summer of 2017. Tr. at 152:18–22; 158:9–15. MVP might find immediate possession convenient, but convenience cannot justify an injunction. *Citifinancial, Inc. v. Lightner*, Civ. No. 5:06-cv-145, 2007 WL 3088087, at *2 (N.D. W. Va. Oct. 22, 2007). MVP must make a clear showing that irreparable harm is likely and *imminent. Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991). It has failed to do so. Because MVP can meet its FERC-imposed deadline without the immediate possession it seeks, this case is unlike *Sage*. Without that key element, MVP's claimed harm is only self-inflicted economic loss, and MVP fails to meet the *Real Truth About Obama* standard.

**B. MVP's Claimed Economic Losses Cannot Constitute Irreparable Harm.**

"[M]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of [equitable relief], are not enough" to support equitable relief.; *Long*, 432 F.2d at 980. *See also Hughes Network Sys., Inc. v. InterDigital Comms. Corp.*, 17 F.3d 691,

---

[4] MVP could implement those schedules without skipping parcels, further distinguishing this case from *Sage*.

694 (4th Cir. 1994); *Di Biase*, 872 F.3d at 230; *Mylan Pharm., Inc.*, 23 F.Supp.3d at 646 (holding that "purely economic injury and economic loss alone, however substantial, does not constitute irreparable harm" (internal quotation marks omitted)). Notwithstanding that rule, MVP asserts that *Sage* stands for the proposition that financial harm to a pipeline developer is sufficient to constitute irreparable harm. ECF # 97 at 19.[5] For that to be so, however, *Sage* would have had to abrogate *Long* and its progeny, which it did not purport to do.[6] *Sage* did not find economic loss to be irreparable harm; rather it was the risk of missing the FERC deadline that was the true irreparable harm. 361 F.3d at 820–30.

MVP asserts that "monetary loss constitutes irreparable harm when the compensation for the loss is not recoverable." ECF #97 at 19 (citing *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 Fed. App'x 251, 263 (4th Cir. 2017) (unpublished)). *Handsome Brook Farm*, however, reaffirms the rule that "monetary damages generally do not give rise to irreparable harm" and merely acknowledges that "irreparable harm *may* still occur in

---

[5] In its Reply, MVP relied on eight NGA district court opinions to support its contention that economic loss to a pipeline developer is irreparable harm. ECF #97 at 19–20. Four of those cases were uncontested, or, as one court called them, "default injunction[s]". *Transcon. Gas Pipe Line Co., LLC v. Permanent Easement for 0.03 Acres*, No. 4:17-cv-00565, 2017 WL 3485752, at *1 (M.D. Pa. Aug. 15, 2017); *Rover Pipeline, LLC v. Rover Tract No(s)*, No. 1:17CV18, 2017 WL 5589163, at *2 (N.D. W. Va. Mar. 7, 2017); *Sabal Trail Trans., LLC v. 0.36 Acres of Land*, No. 5:16-cv-191, 2016 WL 2991161, at *1 (M.D. Fla. May 24, 2016); *Sabal Trail Trans., LLC v. 1.44 Acres of Land*, No. 5:16-cv-164, 2016 WL 2991151, at *1). As such, they are not persuasive. *See Hemingway*, 734 F.3d at 335. In two of the cases, the true irreparable harm was the risk of missing the FERC-imposed deadline, rather than economic loss. *Columbia Gas Trans., LLC v. 171.54 Acres of Land*, No. 2:17-cv-70, 2017 WL 838214, at *7 (S.D. Ohio Mar. 3, 2017); *Fla. Se. Connection, LLC*, 223 F. Supp. 3d at 1227. The remaining two cases are distinguishable because, unlike this case, they did not involve solely economic loss. *Se. Supply Header, LLC v. 180 Acres*, No. 2:07-cv-280, 2008 WL 160700, at *3 (S.D. Miss. Jan. 8, 2008) (finding irreparable harm from risk to in-service date just four months earlier than the FERC-deadline); *Dominion Carolina Gas Trans., LLC v. 1.169 Acres*, 218 F.Supp.3d 476, 479 (D.S.C. 2016) (finding irreparable harm from risk to federally imposed deadline on pipeline customer).

[6] Even if there were a conflict between *Sage* and *Long*, the latter would control. *McMellon v. U.S.*, 387 F.3d 329, 332 (4th Cir. 2004).

4

extraordinary circumstances." *Id*. (emphasis added). The case on which *Handsome Brook Farm* relied—*Hughes Network Systems*—acknowledges a "quite narrow" exception to the general rule barring economic losses from constituting irreparable harm where money damages would otherwise be available at judgment but either the moving party or the nonmoving party may not survive to judgment absent an injunction. 17 F.3d at 694. *See also SAS Institute, Inc. v. World Programming Ltd.*, 874 F.3d 370, 387 (4th Cir. 2007) (characterizing the *Hughes* exception as "narrow"). The first circumstance in that narrow exception is not present here because MVP will survive to construct its pipeline even without immediate possession. Tr. at 179:17 to 180:4. The second circumstance in the narrow exception is not applicable here because this is not a case where a plaintiff has a claim for money damages against an impecunious defendant.

In other words, MVP cannot aid its case by characterizing its monetary losses as unrecoverable. "[T]he mere fact that economic losses may be unrecoverable does not alone compel a finding of irreparable harm." *Nat'l Min. Ass'n v. Jackson*, 768 F.Supp.2d 34, 53 (D.D.C. 2011). It is true that MVP cannot recover any losses it may suffer from Landowners; but it is also true that, because of sovereign immunity, litigants may not recover economic losses that result from administrative actions. The U.S. District Court for the District of Columbia frequently faces the latter situation. In *Air Transport. Ass'n of America, Inc. v. Export-Import Bank of the U.S.*, that court recognized the illogical result of MVP's position: "[I]t would . . . effectively eliminate the irreparable harm requirement. Any movant that could show any damages against an agency with sovereign immunity—even as little as $1—would satisfy the standard." 840 F.Supp.2d 327, 334–36 (D.D.C. 2012). "The wiser formula," the court concluded "requires that the economic harm be significant, even where it is irretrievable[.]" *Id.* at 336. That is the reason that the Fourth Circuit and its district courts hold that economic losses must threaten

the existence of the movant's business. *Fed. Leasing, Inc. v. Underwriters at Lloyd's*, 650 F.2d 495, 500 (4th Cir. 1981);[7] *Ohio Valley Envtl. Coalition, Inc. v. Pruitt*, No. 3:15-cv-271, 2017 WL 1712527, at *9 (S.D. W. Va. May 2, 2017); *Amtote Int'l, Inc. v. PNGI Charles Town Gaming Liab. Co.*, 998 F.Supp. 674, 678 (N.D. W. Va. 1998). MVP's proposed rule would effectively eliminate the irreparable harm requirement in NGA immediate possession cases, violating *Winter* and *The Rule Truth About Obama*.[8] Mr. Cooper admitted that the proposed pipeline will "most likely" be constructed even absent possession by February 1, 2018. Tr. at 179:17 to 180:4. Thus, its claimed economic losses are not substantial enough, even if unrecoverable, to be irreparable harm. *Fed. Leasing*, 650 F.2d at 500; *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.Cir.1985).

### C. MVP's Exaggerated Economic Losses Are Merely Possible, Rather Than Likely.

Even if the economic harms claimed by MVP were cognizable as irreparable harm, MVP has failed to make a clear showing that those harms are *likely* to occur. Rather, MVP has only shown that it is possible it may incur economic losses in some unquantified amount. The evidence shows that the dollar values offered by MVP for each of the three categories of economic harm that it quantified were *maximum* losses. Tr. at 205 (maximum delayed gross revenue); 55 (maximum contractual penalties); 176–77 (aggregate, unmitigated administrative costs). Because MVP relies on maximum values, at most it has established what might possibly happen, not what is likely to happen. Under *Real Truth About Obama*, a mere possibility of irreparable harm is not enough. 75 F.3d at 346. MVP has failed to quantify the likely amount of harm, impermissibly asking the Court to speculate as to the level of harm. *See Bloodgood v.*

---

[7] *See also A Helping Hand, LLC v. Baltimore Cty., MD*, 355 F. App'x 773, 776 (4th Cir. 2009) (characterizing the holding from *Fed. Leasing* as "finding irreparable injury only when economic losses threatened the very existence of the business") (unpublished opinion).

[8] Adopting MVP's position would also conflict with this Court's opinion in *Mylan Pharm*, 23 F.Supp.3d at 646, because that case involved claims of economic loss that were unrecoverable from a federal agency defendant.

*Garraghty*, 783 F.2d 470, 475–76 (4th Cir. 1986) (holding that "the court must decide whether the harm will *in fact* occur"); *Direx Israel*, 952 F.2d at 812 (irreparable harm cannot be speculative). MVP has failed to carry its burden under *Real Truth About Obama*.

### 1. MVP's Claims of Delayed Revenue Are Not Irreparable Harm.

MVP alleges it will lose $40-$50 million in revenue for every month the in-service date of the proposed pipeline is delayed, based solely on the testimony of Mr. Cooper and without any supporting data in the record.[9] Tr. at 143. Revenue, however, is not the same as profits. Although MVP has identified its claimed *gross* monthly revenue, it has not offered evidence of its costs, which are needed to determine the *net profit* that would be delayed. Mr. Cooper acknowledged the existence of operation and maintenance costs, but has never quantified them. *Id.* at 205. Without knowing MVP's costs, gross revenue numbers are meaningless and speculative, falling short of the clear showing required by *Real Truth About Obama*. *Bloodgood*, 783 F.2d at 476.

Moreover, MVP's sources of alleged revenue are its corporate affiliates. Ps' Ex. 1 at 5–6 & nn. 12–16. As a result, to the extent that MVP "loses" revenue each month that its pipeline is not in service, its corporate affiliates *retain that same amount of money*. A disadvantage to one member of the corporate family—delayed revenue—is an advantage to another member of the same family—avoided shipping costs. Tr. at 144:7–9. In other words, it is a wash.

MVP's claimed "lost revenue" is, at worst, merely "delayed revenue." Those revenues stem from 20-year agreements that do not start to run until service begins. *See, e.g.*, P's Ex. 3 at Bates No. MVP_0008025, ¶5(d)(ii). MVP will have 20 years of revenue from its pipeline, regardless of when the pipeline is placed in service. Tr. at 142.

MVP claims no threat of penalties from its shipping contracts and cannot. Its contracts

---

[9] By failing to provide the shipping rates underlying its revenue claims, MVP fails to satisfy the applicable clear and convincing standard. *Deutsche Bank Tr. Co. Amer. v. Mountain W. Hosp., LLC*, No. 1:17CV75, 2017 WL 6420280, at *1 (N.D. W. Va. Dec. 15, 2017).

expressly provide that MVP "shall not be liable in any manner to [its] Shipper[s] due to [its] failure to complete the construction of the Project within the timeframe contemplated herein." P's Ex. 3 at Bates No. MVP_0008028, ¶7(c). Moreover, the shipping contracts expressly allow MVP until June 1, 2020, to place the pipeline in service. *Id.* at Bates No. MVP_0008029, ¶8(b).[10] In short, the terms of MVP's shipping contracts would not harm MVP absent an injunction.

Finally, MVP's effort to claim that, without an injunction, it will lose the "time value of money" from delayed revenues fails to clearly establish irreparable harm. Mr. Cooper admitted he was not qualified to calculate such a figure and was not offering one, Tr. at 144, again leaving the Court to speculate.[11] *Direx Israel*, 952 F.2d at 812. Whether such loss would occur—and the amount of the potential loss—is too speculative to support an injunction. *Bloodgood*, 784 F.2d at 476. Moreover, any such loss does not threaten MVP's existence and, therefore, does not constitute irreparable harm. *Fed. Leasing*, 650 F.2d at 500; *Wisc. Gas*, 758 F.2d at 674.

### 2. MVP's Claimed Contractual Penalties Are Not Irreparable Harm.

MVP claims that construction delays may force it to pay up to $200 million in delay charges and cancellation penalties to its contractors. Tr. at 154–55. Those delay charges and cancellation fees are included in the terms of the purchase orders issued under MVP's contracts with its three main contractors on the pipeline. Tr. at 148–49. The evidence shows that MVP wildly exaggerates the amount of delay and cancellation charges it would actually pay, however.

As a threshold matter, MVP's alleged contractual penalties do not directly stem from lack of access to Landowner's property. Rather, they are self-inflicted by MVP's entry into construction contracts and issuance of purchase orders that include the penalty provisions about

---

[10] That provision demonstrates that MVP's shippers were content to assume the risk that the pipeline may not be in service by the preferred December 2018 date. Tr. at 142:14–1.

[11] The proper methodology for calculating the time value of money frequently results in battles of the experts. *E.g.*, *U.S. v. Allegheny Ludlum Corp.*, 366 F.3d 164, 178 (3d Cir. 2004).

which MVP now complains. MVP voluntarily entered into those contracts. *Id*. MVP executed one of the contracts, and issued multiple purchase orders thereunder, *before* it even received its FERC Certificate. *See, e.g.*, Tr. at 149:2–7. MVP executed all of the contracts and issued all of the purchase orders issued *before* it obtained access to all of the properties along the pipeline route. *See generally* P's Ex. 3. MVP did not even contemplate securing crews to work in 2019 rather than 2018. Tr. at 156:21 to 157:2. By issuing purchase orders, MVP assumed the risk of delay charges and cancellation penalties. Tr. at 149, 169. Under the law of the Fourth Circuit and its district courts, MVP may not "claim equity in [its] own defaults" that result in "injur[ies] of [its] own making." *Long* 532 F.2d at 981; *see also Rose v. Logan*, No. BR 12-25471-RAG, 2014 WL 3616380, at *3 (D.Md. July 21, 2014) (equitable relief unavailable to party that "is the cause of the irreparable injury he is claiming"); *Atl. Capes Fisheries, Inc. v. Gutierrez*, 474 F.Supp.2d 768, 773 (E.D.N.C. 2007) (party acting at its own risk may not seek equitable relief to protect it from the injuries it risked); *Five Platters, Inc. v. Purdie*, 419 F.Supp. 372, 388 (D.Md. 1976) (refusing equitable relief to protect movant from harm from voluntary contractual obligations); *Mandel v. U.S. Dep't of Health, Ed. & Welfare*, 417 F.Supp. 57, 59 (D.Md. 1976) (equitable relief not available where potential injuries arise from movant's own behavior).[12]

This case is like *Davis v. Mineta*, in which the Tenth Circuit, in the preliminary injunction context, rejected claims of financial penalties from delay as "self-inflicted" because the parties prematurely entered into "contractual obligations that anticipated a *pro forma* result." 302 F.3d 1104, 1116 (10th Cir. 2002). *See also Sierra Club v. USACOE*, 645 F.2d 978, 997 (8th Cir. 2011); *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 806 (3d Cir. 1998).

---

[12] Although the Fourth Circuit considered "self-made harm" in its injunction analysis in a false-advertising case, the harm that it considered was harm to the non-movant. *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 284 (4th Cir. 2002). It reasoned that ignoring self-made harm to a defendant in that type of case would always tilt the balance of the harms to the plaintiff. *Id.*

9

Moreover, MVP's contractual penalties are highly unlikely to reach $200 million, if they occur at all, rendering them legally irrelevant. *Winter*, 555 U.S. at 20; *Bloodgood*, 783 F.2d at 475–76. MVP's project manager admitted in his testimony that the $200 million is an absolute maximum and that he had multiple ways to mitigate the contractual penalties. Tr. at 156:8–15.

MVP has voluntarily obtained access to approximately 90% of the subject parcels in West Virginia. *Id.* at 112:8–16. Mr. Cooper testified that he could direct MVP's contractors to work on those parcels and substantially mitigate the delay charges. *Id.* at 156:12–15. Furthermore, Mr. Cooper admitted that only approximately one-third of the $200 million figure was at issue in the counties under this Court's jurisdiction because only two or three of the nine construction "spreads" are located here. *Id.* at 141:14–19; 155:4–12. Mr. Cooper admitted that he could further substantially reduce the penalties for those spreads by cancelling the purchase orders applicable to them, thereby eliminating the delay charges. *Id.* at 155–56. MVP has never quantified those cancellation penalties. MVP's ability to mitigate its losses undercuts its claim of irreparable harm. *HCI Techs., Inc. v. Avaya, Inc.*, 446 F.Supp.2d 518, 521 (E.D. Va. 2006).

MVP's construction contracts also allow suspension of obligations on the basis of "Force Majeure Events." P's Ex. 6 at Bates No. MVP_0010161. Mr. Cooper may not have considered the Force Majeure provisions when he calculated the delay and cancellation charges. Tr. at 149–50. If, despite its reasonable efforts and due diligence, MVP were unable to obtain immediate possession, it could invoke the Force Majeure provisions of its contracts in Section 5.8 and/or issue a Change Order to modify the purchase order penalties under Section 4.6. P's Ex. 6 at Bates Nos. MVP_0010172–73; MVP_0010170. Thus, MVP's contracts may allow it to eliminate any delay charges imposed by its purchase orders, rendering any penalties merely *possible*.

Finally, even if the "worst-case-scenario" were accurate, in the context of this massive

10

project, $200 million is a small percentage of the total cost and nearly within the project's budgeted contingency. Mr. Cooper testified that the $3.7 billion project budget includes approximately $180 million dollars in unallocated contingencies, and MVP's claimed $200 million in contractual penalties is substantially similar to the 5% contingency. *Id.* at 180. Mr. Cooper further admitted that a 5% increase in construction costs is not unusual. *Id.* at 180–81. Even large monetary losses must be compared to the project's overall costs. For example, in *Air Transport. Ass'n*, the court held that "an extreme hypothetical" was not sufficient to constitute irreparable harm because it represented "less than 7% of [the movant's] business, a figure that hardly seems ruinous." 840 F.Supp.2d 327, 338 (D.D.C. 2012). MVP's hypothetical losses here of approximately 5% are, likewise, not ruinous. Tr. at 179:15 to 180:4.

### 3. MVP's Claims of Increased Carrying Costs Are Not Irreparable Harm.

In MVP's final category of claimed irreparable injury are carrying costs of approximately $40 million. Tr. at 169. MVP's claims are exaggerated and do not support a finding of irreparable injury. MVP's administrative costs are self-inflicted and therefore should be excluded from the irreparable harm analysis under *Long*, 432 F.2d at 981, and the other cases cited above.

In any event, MVP's claimed $40 million in administrative costs are approximately 1% of its $3.7 billion capital budget. *Id.* at 209:5–7. MVP's project manager testified that he would recommend that the project proceed even with a 1% increase in cost. *Id.* at 183:15–17. Further, MVP admits that it can mitigate its claimed administrative costs (*id.* at 169–177; 176:24 to 177:13), undermining MVP's claims. *Cf. HCI Techs., Inc., Inc.*, 446 F.Supp.2d at 521 (preliminary-injunction movant's "ability to mitigate its losses" undercuts claim of irreparable harm). Finally, some of the categories of losses are not cognizable at all. *Renegotiation Bd. v. Bannercraft Clothing Co., Inc.*, 415 U.S. 1, 24 (1974) ("[M]ere litigation expense, even

substantial and unrecoupable cost, does not constitute irreparable injury."). In short, MVP's claimed additional administrative costs are not clear evidence of likely irreparable harm.

### 4. MVP's Speculative Claim of Reputational Harm is Simply Economic Loss.

"The loss of business opportunities, market share, and customer goodwill are typically considered to be economic harms." *Air Transp. Ass'n of Am., Inc.*, 840 F.Supp.2d at 335. That is consistent with the law of Fourth Circuit and this Court. *See Virginia Carolina Tools, Inc. v. Int'l Tool Supply, Inc.*, 984 F.2d 113, 120 (4th Cir 1993) (upholding a district ruling that injury to reputation was a "highly speculative and largely economic injur[y]" that did not "constitute irreparable harm"); *Morrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889 F.2d 524, 526–27 (4th Cir. 1989) (recognizing rule that harm to goodwill does not constitute irreparable harm unless it threatens existence of business); *Cook v. Robinson*, No. 5:11CV6, 2011 WL 841287, at *8 (N.D. W. Va. Mar. 8, 2011) (recognizing the rule that "lost income, opportunities, and professional relationships are not irreparable injuries"). Accordingly, MVP's claimed reputational harms are economic harm that cannot constitute irreparable injury.

MVP's reputation evidence fails to clearly show *likely* irreparable harm. Mr. Cooper testified about MVP's reputation among construction contractors and its reputation among prospective shippers on potential future pipelines. Tr. at 123. MVP's claims about both types of harm are speculative. Lacking from Mr. Cooper's testimony was any evidence that a single construction firm or gas shipper has expressed an unwillingness to work with MVP if it fails to adhere to its preferred schedule. MVP's evidence establishes only the *possibility* of reputational harm. But, as this Court observed in *Audiology Distribution, LLC. v. Hawkins*, after *Winter*, the mere possibility of reputational harm is not adequate to clearly show that irreparable harm is likely. No. 5:13CV154, 2013 WL 6583849, at *5 (N.D. W. Va. Dec. 16, 2013). *See also SAS*

*Institute*, 874 F.3d at 386; *John Doe Co. v. C.F.P.B.*, 849 F.3d 1129, 1134–35 (D.C. Cir. 2017).

As to MVP's claimed harm to its reputation among contractors, MVP asserts that cancelling its purchase orders could lead its contractors to "look at the project as one with more concern"—leading to less competitive rates and an unwillingness to agree to perform future work. Tr. at 122–23. MVP, however, assumed the risk of that reputation injury when it chose to issue purchase orders for its preferred construction schedule and its attendant breakneck pace and unresolved property access issues. MVP issued those purchase orders before it even had its FERC Certificate (*id.* at 149, 169), knowing that it may have to terminate the purchase orders for any number of reasons, including lack of property access. At that point, MVP could have chosen to issue purchase orders for construction in accordance with one of its alternative schedules, which would not have carried such high risk of reputational injury. *Id.* at 179:10–14. It chose the riskier option, accepting the possibility that it may have to cancel the purchase orders and potentially harm its reputation with construction firms. *Id.* at 149, 157. 169. If MVP's reputation is now at stake, that is the result of its own voluntary actions—its preferred schedule was not mandated by FERC or its shipping contracts. Under Fourth Circuit law, equity cannot rescue a party from injuries of its own making. *Long*, 532 F.2d at 981.

Moreover, Mr. Cooper's testimony about reputational harm among contractors is speculative. Mr. Cooper has not directly asked his contractors about their availability to begin construction in November 2018. Tr. at 156:21–23; 157:22–24. Indeed, he never specifically contemplated it. *Id.* at 156:21 to 157:1–2. Mr. Cooper admitted, when asked if he was speculating about the availability of crews for a November 2018 start date, that his statement "has a level of evaluation to it, yes sir." *Id.* at 157:3–7. When asked if he could confirm how many crews were unavailable for the November 2018 alternative schedules, all that Mr. Cooper

13

could say was that "they *may* not be." *Id.* Tr. 157 at 13–21. Such speculative claims are insufficient. *See SAS Institute*, 874 F.3d at 386; *Direx Israel*, 952 F.2d at 812. Moreover, Mr. Cooper's testimony about harm to MVP's reputation among construction firms is contradicted by his testimony that MVP will most likely construct the pipeline even without immediate possession by February 1, 2018 *and* even taking into consideration his concerns about rehiring contractors. Tr. at 179:17–21; 180:2–4. Accordingly, any harm to MVP's reputation with contractors would not jeopardize MVP's existence and cannot be irreparable. *Morrow Furniture Galleries*, 889 F.2d at 526–27. At most, Mr. Cooper's testimony establishes that reputational harm among construction firms is *possible*, but not that it is likely.

MVP also alleges possible harm to its reputation among gas shippers who may at some point consider retaining its services to build an additional pipeline, Tr. at 120, 123, but that is wholly speculative. MVP was organized to "build[] *this* pipeline." *Id.* at 80 (emphasis added). When asked how many other pipelines MVP is planning to build at this time, Mr. Cooper replied: this pipeline. *Id.* at 178:2–4. MVP has not identified any plans to develop additional pipelines; rather the evidence merely shows that its corporate parent, which is not a party to this action, has some employees who have job descriptions that would include developing that kind of business. *Id.* at 178 to 179. Mr. Cooper denied having any basis to know whether there are any new pipeline projects lined up at this time, and he has not been privy to any company wide conversations about such plans. *Id.* Accordingly, the alleged reputational harm as to future pipelines is impermissible speculation, *Direx Israel*, 952 F.2d at 812, and falls far short of the requirements of *Real Truth About Obama* and *Winter*.

Moreover, MVP's claims of reputational harm among gas shippers are fanciful. MVP conjures the possibility that future potential pipeline customers might judge MVP poorly because

it constructed a pipeline on the schedule required by FERC and its shippers, but not faster. Not only is such a conclusion impermissibly speculative, it is implausible.

### 5. Lack of Property Access is Note the Sole Cause of MVP's Alleged Injuries.

If a preliminary-injunction movant "will suffer the same harm with or without an injunction, th[at] undermin[es] the need for injunctive relief in the first place." *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 735 F.3d 1352, 1363 (Fed. Cir. 2013). *See also Wisc. Gas*, 758 F.2d at 674 (holding that "the movant must show that the alleged harm will directly result from the action which the movant seeks to enjoin."). That principle defeats MVP's motion.

MVP has not even submitted the paperwork that would allow it to begin tree-cutting and construction on condemned properties. Tr. at 161:11–13. Even if this Court were to grant MVP an injunction, MVP would likely find itself lacking the necessary FERC approvals, due to the time it takes FERC to approve notices to proceed. Tr. at 160–165; *see also id.* at 164:8–20 (admitting there is not enough time to obtain a notice to proceed before February 1, 2018). It is not property access that jeopardizes MVP's preferred schedule, it is the lack of FERC approval.

## CONCLUSION

For the foregoing reasons, and the reasons set out in their response briefs (ECF Nos. 69 & 70), Landowners respectfully request that the Court deny MVP's immediate possession motion.[13]

---

[13] If the Court were to grant MVP's motion, it should direct the parties to submit further evidence regarding the amount and terms of the Rule 65(c) security because the evidence before the Court is not credible or reliable enough to determine the security amount. *See In re Transcon. Gas Pipeline Co. LLC*, No. 1:16-cv-02991, 2016 WL 8861714, at *11 (N.D. Ga. Nov. 10, 2016). The appraisals offered by MVP are not compliant with the Uniform Standards of Professional Appraisal Practice ("USPAP"). Tr. at 261–62. *Sage* allows immediate possession under Rule 65 because its protections are roughly comparable to the Declaration of Takings Act ("DTA"). 361 F.3d at 825. In DTA proceedings, deposits prior to quick-take should be based on USPAP-compliant appraisals. 42 U.S.C. § 4651(4); 49 C.F.R. § 24.103. To be true to *Sage*, the Rule 65(c) security in this preliminary proceeding should likewise be based on a USPAP compliant appraisal. MVP's offered security amount is not based on such an appraisal.

DATED:   January 26, 2018                    Respectfully submitted,

**/s/ Derek O. Teaney**
DEREK O. TEANEY (WVBN 10223)
APPALACHIAN MOUNTAIN ADVOCATES, INC.
P.O. Box 507
Lewisburg, WV 24901
Telephone: (304) 793-9007
Facsimile: (304) 645-9008
dteaney@appalmad.org
*Counsel for Appalachian Mountain*
 *Advocates Defendants*

**/s/ Isak J. Howell**
ISAK J. HOWELL (WVBN 11558)
LAW OFFICE OF ISAK HOWELL
119 Norfolk Ave. SW # 330
Roanoke, VA 24011
Telephone: (540) 998-7744
Facsimile: (304) 645-9008
isak@howell-lawoffice.com
*Counsel for Law Office of Isak Howell*
 *Defendants*

**/s/ Charles M. Lollar Jr.**
CHARLES M. LOLLAR JR. (WVBN 13013)
LOLLAR LAW, PLLC
109 E. Main St., Suite 501
Norfolk, VA 23510
Telephone: (757) 644-4657
Facsimile: (757) 644-4659
chuck@lollarlaw.com
*Counsel for Lollar Law Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| MOUNTAIN VALLEY PIPELINE, L.L.C., | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 1:17-cv-211 |
| AN EASEMENT TO CONSTRUCT, OPERATE AND MAINTAIN A 42-INCH GAS TRANSMISSION LINE ACROSS PROPERTIES IN THE COUNTIES OF BRAXTON, LEWIS, HARRISON, WEBSTER AND WETZEL, WEST VIRGINIA, et al., | ) |
| Defendants. | ) |

**Certificate of Service**

I hereby certify that, on January 26, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel of record.

/s/ Derek O. Teaney
DEREK O. TEANEY (W. Va. Bar No. 10223)